# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOSH D. BAUMAN** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-1176** |
| **BURL CAIN, WARDEN** | **SECTION "R"(2)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, I have determined that a federal evidentiary hearing is unnecessary. <u>See</u> 28 U.S.C. § 2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).

# I.    STATE COURT PROCEDURAL BACKGROUND

The petitioner, Josh D. Bauman, is currently incarcerated in the Louisiana State

Penitentiary in Angola, Louisiana.[2]  Bauman was indicted by a grand jury in Jefferson

Parish on November 4, 2004, for the second degree murder of his ex-wife, Michelle

Bauman.[3]  He entered a plea of not guilty on November 5, 2004.[4]  The Louisiana Fifth

Circuit Court of Appeal summarized the facts of the case as follows:

> Testimony of witnesses at pre-trial suppression hearings and at trial revealed
> the following facts.  Brandy Ronquille testified that she and Michelle Bauman were
> longtime friends and co-workers.  Ronquille stated that they worked at International
> Drug Detection ("IDD").  Their office was one of six businesses located at 7521
> Westbank Expressway in Marrero, Louisiana.  On September 7, 2004, Ms. Ronquille
> left the office, as usual, at about 11:00 a.m. to get lunch from a nearby restaurant.
> When Ms. Ronquille left the office, Ms. Bauman was alone in their office doing
> paperwork.
>
> Joann McKnight, who had been good friends with Michelle Bauman for ten
> years, worked at a doctor's office two doors down from Michelle's office.  On the
> morning of September 7, 2004, a patient entered her office saying that a woman was
> outside screaming that her husband had shot her.  When Ms. McKnight went outside,
> she saw Ms. Bauman lying on the sidewalk between their offices.  She held Ms.
> Bauman's hand and talked to her; Ms. Bauman tried to say something to her, but she
> was unable to speak.  McKnight's employer, Dr. Vo, came outside to help Ms.
> Bauman.
>
> Dr. Fong Vo, who has an internal medicine practice at 7521 Westbank
> Expressway, worked with Michelle Bauman for four years.  Dr. Vo testified that, at
> around noon, on September 7, 2004, he was examining patients when he heard
> people shouting in the front of his office.  He went to investigate, and found Ms.
> Bauman on the ground outside the entryway to his office.  Ms. Bauman was lying
> face-down.  He turned her over and saw a lot of blood in her right eye.  He found an

---

[2]Rec. Doc. No. 8.

[3]St. Rec. Vol. 1 of 9, Indictment, 11/4/04; Grand Jury Return, 11/4/04.

[4]St. Rec. Vol. 1 of 9, Minute Entry, 11/5/04.

entry wound in her cheek. Ms. Bauman was not talking. She was grunting and moaning. Dr. Vo attempted to provide medical treatment to Michelle Bauman.

While Dr. Vo was tending to Michelle, Ms. McKnight went to the IDD office to look for Ms. Ronquille. When Ms. McKnight entered the IDD offices, she saw a man sitting on the floor, slumped against a wall with his legs straight out. She did not immediately recognize him. Ms. McKnight called 9-1-1 from a telephone in the IDD office. While she spoke to the 9-1-1 operator, she realized that the injured man was Josh Bauman. At that point, Josh Bauman picked up the gun, and Ms. McKnight thought he was going to shoot her. Instead, he pointed the gun at his own head. Ms. McKnight immediately fled the IDD office.

Debra Guidroz, who worked for Dr. Vo in the same building as Michelle, called 9-1-1 from her office, when she heard that there was a woman, who was bleeding, outside calling for help because her husband had shot her. After calling for help, Ms. Guidroz, who had known and worked with Michelle Bauman since 1994, went to the IDD office. When she entered the office, she saw a man, with blood on his head and shirt, sitting on the floor leaning against the wall. A gun was lying on his chest/stomach area. Ms. Guidroz testified she did not see anyone else inside the IDD office, nor did she see anyone fleeing the scene.

Deputy Paul Sperandeo of the Jefferson Parish Sheriff's Office testified that, at about noon on September 7, 2004, he responded to a reported shooting at 7521 Westbank Expressway in Marrero, Louisiana. He and his partner arrived at the scene less than five minutes after receiving the report.

Deputy Sperandeo testified that, when he and his partner approached the business, several people standing outside told them, "'He's in there, he's in there.'" An injured woman was lying on the sidewalk near the doorway, and someone was giving her medical assistance.

When Deputy Sperandeo entered the business, he saw a man sitting on the floor, leaning against a wall. There was blood on his head and body, and he was unresponsive. There was a chrome revolver lying between his right arm and his body. The barrel of the gun pointed towards defendant's head. When paramedics arrived to assist defendant, Deputy Sperandeo's partner retrieved the gun.

Homicide Detective David Morales, who was the lead investigator of the shootings, arrived to find a 1994 Buick Century with a Missouri license plate parked at an odd angle in the parking lot. Through a computer search, Detective Morales learned that the car was registered to Danny Bauman from Ridgedale, Missouri. The car's front windows were rolled down, and Detective Morales saw a handwritten note on the front passenger seat. The note read, "'Judy and Danny Bauman, 417-239-1154, call and tell them I love them and I am sorry. Josh.'"

Detective Morales seized the note and called the telephone number on the note. He learned that Josh Bauman had been living with his parents, Danny and Judy, in Ridgedale, Missouri, until three days earlier. Detective Morales made arrangements to have the car towed to the detective bureau, and he later obtained a warrant to search the vehicle.

3

Detective Morales testified that Sergeant Rodney Newman collected a .22 caliber Smith and Wesson revolver from the injured man. The chamber of the gun contained six spent cartridge casings, indicating that it had been fired six times. A lead bullet fragment was found on the floor in the IDD office where the shootings occurred. Detective Morales traced the weapon through the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and determined it was purchased by Danny Bauman, defendant's father.

Michelle Bauman was pronounced dead on arrival at the hospital. Detective Morales arrested Josh Bauman for second degree murder within an hour of the shootings.

Dr. Susan Garcia of the Jefferson Parish Forensic Center, who was accepted as an expert in forensic pathology, performed an autopsy on Michelle Bauman's body on September 8, 2004. Her autopsy report was introduced into the record at trial.

Dr. Garcia testified that Ms. Bauman had three entrance gunshot wounds and one exit wound. . . .

Dr. Garcia testified that the lethal wound was the one to the victim's back, which caused injury to the right lung and a great deal of internal bleeding. Dr. Garcia classified Ms. Bauman's death as a homicide.

The trial court accepted Joel O'Lear as an expert in forensic firearms analysis and identification, and tool mark evaluation. Mr. O'Lear testified that he examined the .22 caliber Smith and Wesson revolver, six cartridge casings, one unknown caliber lead-like fragment, two unknown caliber lead-like projectiles, and a group of small lead-like fragments. Mr. O'Lear testified that the six cartridge casings were all .22 caliber class and were all fired from the same gun to the exclusion of all other weapons.

Defendant also testified in his own behalf. He had lived in Jefferson Parish all of his life, except for the year before the shooting, which he spent living with his parents in Missouri. He had returned to Louisiana three days before the shooting to take a job as a welder. He was staying in a motel.

Defendant and Michelle met during the 1980s. They were married in 2000, and divorced in 2003. During their thirteen-year relationship, they had one daughter, Logan, who was six years old when they divorced.

Defendant testified that, on the morning of September 7, 2004, he drank a case and a half of beer while he drove around Gretna. When he called Ms. Bauman at her office to discuss their daughter, Ms. Bauman hung up on him. Because he was "aggravated" and "mad," defendant "flew over there to her work" to confront Michelle. Before he left his car, he wrote a note for his parents, which he left on the front seat of the car. He stated that he wrote the note because he knew that he would be going to jail "eventually . . . because of the stupid thing" he did.

Defendant, armed with his father's gun, entered Michelle's office. He was carrying the gun to deter anyone from impeding his conversation with his ex-wife. He also admitted that he thought the gun might "scare" Michelle into letting him see

4

his daughter. When Ms. Bauman questioned him about his intent, he told her that he had come to finish their telephone conversation. Ms. Bauman told him he was nothing more than a "sperm donor" to Logan, and that she would never allow him to see her.

According to defendant, Ms. Bauman then tried to take the gun away from him. While they were struggling, he got control of the gun and, in a rage, shot her in the shoulder. Even though he did not remember it, he knew that he shot his ex-wife three more times. He also did not remember shooting himself twice in the head. As a result of his self-inflicted wounds, defendant was in a coma for a month. He has no sight in his right eye, and seizures due to brain swelling. He complains of memory loss limited to events immediately before and after the shooting.

State v. Bauman, 15 So.3d 177, 180-83 (La. App. 5th Cir. 2009); State Record Volume 7 of 9, Louisiana Fifth Circuit Court of Appeal Opinion, 08-KA-1169, pages 3-8, May 12, 2009.

After determining that Bauman was competent, the state trial court denied his motion to suppress evidence at a hearing held on January 11, 2008.[5] Bauman's subsequent writ applications to the Louisiana Fifth Circuit and the Louisiana Supreme Court also were denied.[6]

---

[5]St. Rec. Vol. 1 of 9, Minute Entry, 1/11/08; Hearing Transcript, 1/11/08; Sanity Hearing Minutes, 12/13/06; Hearing Transcript, 12/13/06; Sanity Hearing Minutes, 12/3/07; Hearing Transcript, 12/3/07; Motion to Appoint Sanity Commission, 9/28/06;

[6]St. Rec. Vol. 1 of 9, 5th Cir. Order, 08-K-98, 2/8/08; La. S. Ct. Order, 2008-KK-0402, 2/25/08; State v. Bauman, 976 So.2d 1291 (La. 2008); St. Rec. Vol. 9 of 9, 5th Cir. Writ Application, 08-K-98, 2/7/08; La. S. Ct. Writ Application, 08-KK-0402, 2/22/08; St. Rec. Vol. 7 of 9, La. S. Ct. Letter, 2008-KK-402, 2/22/08.

Bauman was tried before a jury on May 13 and 14, 2008, and was found guilty as charged.[7] At a hearing held on June 6, 2008, the state trial court denied Bauman's motion for a new trial.[8] After waiver of legal delays, the court sentenced Bauman that same day to serve life in prison at hard labor without benefit of parole, probation or suspension of sentence.[9]

On direct appeal to the Louisiana Fifth Circuit, Bauman's appointed counsel alleged two errors:[10] (1) The note taken from Bauman's car should have been suppressed because it was illegally obtained. (2) The evidence was insufficient to convict Bauman of second degree murder because the State only proved manslaughter. On May 12, 2009, the Louisiana Fifthe Circuit affirmed the conviction and sentence, finding no merit in either issue.[11]

---

[7]St. Rec. Vol. 1 of 9, Trial Minutes, 5/13/08; Trial Minutes, 5/14/08; Jury Verdict, 5/14/08; St. Rec. Vol. 2 of 9, Trial Transcript, 5/13/08; Trial Transcript, 5/14/08.

[8]St. Rec. Vol. 1 of 9, Sentencing Minutes, 6/6/08; St. Rec. Vol. 7 of 9, Motion for New Trial, 5/20/08; St. Rec. Vol. 2 of 9, Sentencing Transcript, 6/6/08.

[9]Id.

[10]St. Rec. Vol. 2 of 9, Appeal Brief, 08-KA-1169, 11/12/08.

[11]State v. Bauman, 15 So.3d at 187; St. Rec. Vol. 7 of 9, 5th Cir. Opinion, 08-KA-1169, p. 15, 5/12/09.

The Louisiana Supreme Court also denied Bauman's timely[12] writ application without stated reasons on April 23, 2010.[13] Bauman's conviction became final 90 days later, on July 22, 2010, when he did not file a writ application with the United States Supreme Court. Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On March 14, 2011, Bauman submitted an application for post-conviction relief to the state trial court alleging that he received ineffective assistance of counsel because his counsel failed adequately to present the intoxication defense and to secure an expert to support the defense.[14] The state trial court denied the application on April 6, 2011,

---

[12]Although the State suggests this filing may have been untimely because of the "ex rel." and "KH" designations, under the applicable mailbox rule, June 10, 2009, was the earliest date he could have given the pleadings to prison officials for mailing. That date was within the 30 day period allowed under Louisiana law at La. S. Ct. Rule X§5.

[13]State ex rel. Bauman v. State, 34 So.3d 300 (La. 2010); St. Rec. Vol. 7 of 9, La. S. Ct. Order, 2009-KH-1533, 4/23/10; St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 09-KH-1533, 7/9/09 (postmarked 6/12/09, dated 6/10/09); St. Rec. Vol. 7 of 9, La. S. Ct. Letter, 2009-KH-1533, 7/9/09 (showing postmark on 6/12/09).

[14]St. Rec. Vol. 7 of 9, Uniform Application for Post-Conviction Relief, 3/31/11 (dated 3/14/11).

citing <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and related state law and finding the claim conclusory and without merit.[15]

On April 25, 2011, Bauman submitted a writ application seeking review of that ruling in the Louisiana Fifth Circuit.[16] The court denied the application on May 26, 2011, finding no merit in his claim.[17]

Almost two months later, on July 21, 2011, Bauman submitted a writ application to the Louisiana Supreme Court raising the same issue.[18] The court denied the application without stated reasons on April 13, 2012.[19]

II.    <u>FEDERAL HABEAS PETITION</u>

On May 24, 2012, the clerk of this court filed Bauman's petition for federal habeas corpus relief in which he raised three grounds for relief:[20] (1) He was denied effective assistance of counsel. (2) The evidence seized from his vehicle should have been

---

[15]St. Rec. Vol. 7 of 9, Trial Court Order, 4/6/11.

[16]St. Rec. Vol. 8 of 9, 5th Cir. Writ Application, 11-KH-443, 4/27/11 (postmarked 4/25/11).

[17]St. Rec. Vol. 9 of 9, 5th Cir. Order, 11-KH-443, 5/26/11.

[18]St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 11-KH-1667, 7/25/11 (postmarked 7/21/11).

[19]<u>State ex rel. Bauman v. State</u>, 85 So.2d 1243 (La. 2012); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2011-KH-1667, 4/13/12.

[20]Rec. Doc. No. 8, pp. 8-16.

suppressed due to a warrantless search. (3) The State failed to prove guilt beyond a reasonable doubt.

The State filed a response in opposition to Bauman's petition in which it argues that the petition was not timely filed, concedes that the claims are exhausted, and reserves its right to address the merits.[21]

III.     GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254. The AEDPA went into effect on April 24, 1996[22] and applies to habeas petitions filed after that date. Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)). The AEDPA therefore applies to Bauman's petition which, for reasons discussed below, is deemed filed in this federal court on April 26, 2012.[23]

_____

[21]Rec. Doc. No. 15.

[22]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

[23]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. Coleman v. Johnson, 184 F.3d 398, 401 (5th Cir. 1999), cert. denied, 529 U.S. 1057 (2000); Spotville v. Cain, 149 F.3d 374, 378 (5th Cir. 1998); Cooper v. Brookshire, 70 F.3d 377, 379 (5th Cir. 1995). Bauman's petition was filed by the clerk of court on May 24, 2012, when the filing fee was received after denial of his pauper

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State argues that Bauman's petition is not timely filed, but concedes that the claims are exhausted.  While there is some possibility that the State's timeliness calculation is correct, I cannot accept it in light of certain facts asserted by Bauman that have not been addressed by the State.  For the following reasons, I will assume that the petition was timely filed in this court.

Specifically, the one-year AEDPA statute of limitations period began to run in Bauman's case on July 23, 2010, the day after his conviction became final.  28 U.S.C. §2244(d)(1)(A).  The AEDPA statute of limitations period ran without interruption for only 234 days, until March 14, 2011, when he submitted an application for post-conviction relief to the state trial court. When it was denied on April 6, 2011, Bauman timely submitted a writ application to the Louisiana Fifth Circuit on April 25, 2011,

---

application.  Bauman dated the signature on the memorandum in support of his petition on April 26, 2012.  This is the earliest date on which he could have delivered the pleadings to prison officials for mailing.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition.  See Cousin v. Lensing, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing Spotville, 149 F.3d at 374).

which was denied by that court on May 26, 2011. Bauman waited 55 days before he submitted a writ application to the Louisiana Supreme Court on July 21, 2011. This submission was admittedly well beyond the 30 day period allowed under La. S. Ct. Rule X§5.

Bauman, however, claims in this court, as he did in the Louisiana Supreme Court, that the Louisiana Fifth Circuit's order of May 26, 2011, was mailed to him at the wrong prison, Elayn Hunt Correctional Center ("Hunt").[24] Bauman claims that he was transferred from the Louisiana State Penitentiary ("LSP") to Hunt on May 14, 2011, due to area flooding, and he was returned to LSP on May 16, 2011. In spite of this short transition, he contends that the Louisiana Fifth Circuit mailed the May 26, 2011 order to him at Hunt, and it was not routed to him at LSP until June 24, 2011. He submitted to the state courts an envelope from the Louisiana Fifth Circuit purportedly addressed to him at Hunt bearing a postal meter date of May 26, 2011.[25]

I note that the order issued by the Louisiana Fifth Circuit on May 26, 2011, indicates Bauman's address to be at LSP.[26] The record does not indicate that the appellate court was aware of Bauman's temporary transfer nor does it offer any

---

[24]Rec. Doc. No. 8, pp. 8-9; Rec. Doc. No. 16, pp.1-2; see also, St. Rec. Vol. 9 of 9, La. S. Ct. Writ Application, 11-KH-1667, 7/25/11 (postmarked 7/21/11).

[25]See St. Rec. Vol. 9 of 9, Envelope addressed to Hunt, 5/26/11.

[26]St. Rec. Vol. 9 of 9, 5th Cir. Order, 11-KH-443, 5/26/11.

explanation for why Bauman's mail would not have been sent to the LSP address of record.

The State addresses none of this in its discussion of statutory or equitable tolling. Thus, I cannot conclusively determine on this record that Bauman did not have an excusable period of delay that would have tolled the AEDPA limitations period at all relevant times. As Bauman points out, he otherwise appears to have acted within all applicable time periods, without undue delay, at each stage of the appellate and post-conviction proceedings. Under these circumstances and on the record as it is, I cannot conclude with confidence that Bauman's late filing in July 2011 did not toll the AEDPA period in such a way as to render this federal petition timely filed. Accordingly, I will address the merits of Bauman's claims.

IV.    STANDARDS OF MERITS REVIEW

28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28

U.S.C. § 2254(d)(2)), <u>cert. denied</u>, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" <u>Penry v. Johnson</u>, 215 F.3d 504, 507 (5th Cir. 2000) (quoting <u>Miller v. Johnson</u>, 200 F.3d 274, 280-81 (5th Cir.), <u>cert. denied</u>, 531 U.S. 849 (2000)), <u>aff'd in part, rev'd in part on other grounds</u>, 532 U.S. 782 (2001); <u>Hill</u>, 210 F.3d at 485. The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 405-06, 412-13 (2000); <u>Penry</u>, 532 U.S. at 792-93; <u>Hill</u>, 210 F.3d at 485. "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699 (2002). Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom, Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (quoting Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006).

## V.     INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 1)

Bauman alleges that his trial counsel provided ineffective assistance when he failed to prove that Bauman was intoxicated at the time of the shooting and did not obtain an expert to assist in that defense. Bauman specifically argues that his counsel failed to (a) question the State's witnesses about Bauman's intoxicated state, (b) argue that only an intoxicated person would write the type of note left in the car, and (c) present any evidence of his state of mind when he used the gun. Bauman contends that his counsel failed to establish that he was too intoxicated to have had the specific intent required for second degree murder.

In addressing the claim of ineffective assistance of counsel on post-conviction review, the state trial court found that counsel's performance was constitutionally sufficient under the Strickland standard and that Bauman failed to prove prejudice in light of the overwhelming evidence of his guilt. The court also indicated that Bauman's claims were conclusory and speculative. The Louisiana Fifth Circuit found the claims without merit, a decision acquiesced in by the Louisiana Supreme Court's one word denial. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The issue of ineffective assistance of counsel is a mixed question of law and fact. Woodfox v. Cain, 609 F.3d 774, 789 (5th Cir. 2010); Richards v. Quarterman, 566 F.3d 553, 561 (5th Cir. 2009). Thus, the question before this court is whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

The standard for judging performance of counsel was established by the United States Supreme Court in Strickland, relief upon by the state courts, in which the Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel, requiring petitioner to prove both deficient performance and resulting prejudice.

Strickland, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Kimler, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' . . . But it is not enough under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" (citation omitted) Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999) (citing Strickland, 466 U.S. at 689-90). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d at 236-37; Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000), cert. denied, 531 U.S. 1167 (2001).

On habeas review, the United States Supreme Court has recently clarified that, under Strickland, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 788 (2011). The Harrington Court went on to recognize the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

"A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell, 535 U.S. at 697 (citing Strickland, 466 U.S. at 689). This court must apply the "strong presumption" that counsel's strategy and defense tactics fall "within

17

the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690.

Federal courts have consistently recognized that tactical decisions when supported by the

circumstances are objectively reasonable and do not amount to unconstitutionally

deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999), cert. denied,

528 U.S. 1013 (1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997) and

Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that

trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466

U.S. at 689; Moore, 194 F.3d at 591. The burden is on petitioner to demonstrate that

counsel's strategy was constitutionally deficient. Id.

The trial transcript reflects that two witnesses, Debra Guidroz and Joann

McKnight, other than the victim saw Bauman inside the victim's office. Guidroz

testified that immediately after calling 911 from her office, she went next door to the

victim's office.[27] She looked into the office and saw Josh Bauman sitting against the

wall. He appeared to have been shot. McKnight testified that, after seeing Michelle

lying on the ground, she went into the office looking for Brandy, the victim's co-

worker.[28] She saw a man sitting against the wall shot and motionless, but she did not

immediately recognize him as Bauman. She called out to the man that she would get

[27]St. Rec. Vol. 2 of 9, Trial Transcript, p. 55 (Guidroz), 5/14/08.

[28]Id., p. 65 (McKnight).

18

help.[29]  She entered the victim's office to call 911 to report a second shooting victim. That is when she realized that the man was Bauman and that he had a gun. When he began to reach for the gun, she began screaming at the operator that she was going to be shot.[30]  She tried to close the office door, and saw Bauman raise the gun to shoot himself.[31]  She testified that Bauman did not say anything to her.[32]

None of the State's other witnesses interacted with Bauman.  The first officers arrived after Bauman was already non-responsive as a result of his self-inflicted wounds.[33]  During questioning of Detective David Morales, who arrived even later,[34] defense counsel asked him if the medical records contained anything that indicated the presence of alcohol in Bauman's system.[35]  He answered that he believed they did.  The records were admitted into evidence.[36]

---

[29]Id., p. 66.

[30]Id., pp. 66-67.

[31]Id., p. 67.

[32]Id., p. 73.

[33]St. Rec. Vol. 2 of 9, Trial Transcript, p. 15 (Deputy Paul Sperandeo), 5/13/08.

[34]Id., pp. 46-47 (Detective Morales).

[35]Id., p. 54.

[36]Id., pp. 53-54.

Bauman himself testified at trial.  He testified that he drove around that morning and drank "about a case and a half" of beer before he called his wife.[37]  He said that was not an unusual amount for him to drink.[38]  Bauman stated that after she hung up on him, he decided to confront her armed with the gun.  He did not see or interact with anyone as he headed to her office or once he was inside.[39]  He also testified that he sat in the car before entering the office to write an apology note to his parents because he knew he was about to do something that would land him in jail.[40]  Before writing the note, Bauman said he had already decided to scare the victim and anyone else he might encounter with the gun so he could talk to her about their daughter.[41]  He armed himself with the gun, went inside and shot four times.[42]

Bauman suggests that his counsel was deficient for failing to elicit more testimony about his intoxicated state.  Bauman himself testified that he did not interact with anyone before he entered the office or after he was inside, except for the victim.  The testimony

---

[37]St. Rec. Vol. 2 of 9, Trial Transcript, p. 79-80 (Bauman), 5/14/08.

[38]Id.

[39]Id., pp. 83-84.

[40]Id., pp. 82, 84.

[41]Id., pp. 81-82, 83, 85, 89, 91.

[42]Id., pp. 83, 85-86, 94.

of the other witnesses confirms that he did not interact with anyone. Bauman offers no explanation as to how counsel could have elicited testimony that apparently did not exist.

He also argues that his counsel should have argued to the jury that he had to be intoxicated to write the note to his parents. Bauman's suggestion is baseless and conclusory. He presents nothing to support a conclusion that only an intoxicated person would pen a note of apology before shooting someone or himself.

Bauman himself testified before the jury that he had been drinking heavily before he wrote the note. He also indicated that the amount he drank was not unusual for him, since he drank every day. The jury was also shown pictures of the inside of his car reflecting a few apparently empty beer bottles or cans.[43] Thus, evidence of his drinking was before the jury. The jury simply chose not to give it credit or not to find that it influenced his intent to harm his wife. The jury's decision was well within its authority and was not a reflection on counsel's performance.

Bauman also suggests that his counsel should have hired an expert to explain the impacts of intoxication on his ability to have the specific intent necessary for him to have committed second degree murder. The law is well settled that an indigent defendant does not have an automatic right to expert assistance, even upon demand. Yohey v. Collins, 985 F.2d 222, 227 (5th Cir. 1993). Rather, he must "establish a reasonable probability

---

[43]St. Rec. Vol. 4 of 9, see pictures of beer cans, beer bottle, and ice chest.

that the requested experts would have been of assistance to the defense and that denial of such expert assistance resulted in a fundamentally unfair trial." Id.; Griffith v. Quarterman, 2006 WL 2041291 at *5 (5th Cir. Jul. 21, 2006); see also, Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (citing Strickland, 466 U.S. at 687). Bauman has not made a showing that the testimony of an expert would have altered the trial or established that a different outcome would have occurred if counsel would have obtained an expert.

Bauman's arguments on this point are wholly speculative. He has not pointed to any actual evidence which would indicate that he was intoxicated at a level sufficient to impair him. The only evidence was his own testimony that he had consumed alcohol and that – for him – it was not an unusual amount. Counsel presented enough evidence to the jury to raise the inference of Bauman's intoxication by asking both Bauman about how much he drank and Detective Morales about a toxicology report. The record and transcripts, however, contain no specifics or blood levels for Bauman. I have reviewed the three volumes of medical records and police reports and did not locate any toxicology report or blood alcohol count for Bauman.[44] The fact that counsel created the inference and chose not to pursue it appears to have been a reasonable strategy decision under the circumstances.

---

[44]St. Rec. Vols. 4 through 6.

Bauman has not presented proof that an expert was needed or could have offered any specific support to the defense of intoxication. Even with the testimony and pictures of beer cans in his car, the jury chose not to credit his assertion that he was intoxicated to such an extent to impair his thought processes; Bauman admitted that he regularly drank similar amounts and recalled deliberately choosing to arm himself before approaching his ex-wife.

The fact that the defense was not successful, i.e. that Bauman was convicted, does not mean that counsel's actions were deficient. See Martinez v. Dretke, 99 Fed. Appx. 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689 (citations omitted). Bauman has provided no basis to undermine the deference due his counsel's trial decisions.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of Strickland. He is not entitled to relief on this claim.

## VI.    SEIZURE OF EVIDENCE (CLAIM NO. 2)

Bauman alleges that the note retrieved from his car should have been suppressed because it was removed by the detective without a warrant in violation of his Fourth and Fourteenth Amendment rights. He argues that Detective Morales unlawfully removed the note from the car without first obtaining a warrant.

Fourth Amendment violations are generally not cognizable on federal habeas review. Stone v. Powell, 428 U.S. 465 (1976). In Stone, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at trial." (footnotes omitted) Id., at 494. The "full and fair" hearing contemplated by Stone refers to thoughtful consideration by the factfinder and at least the availability of meaningful appellate review by a higher state court. Davis v. Blackburn, 803 F.2d 807, 808 (5th Cir.1986); O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977).

The United States Fifth Circuit has interpreted an "opportunity for full and fair litigation" to mean just that, "an opportunity." Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978); Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002), cert. denied, 537 U.S. 1196 (2003). "If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes." Caver, 577 F.2d at 1192. Thus, it is the opportunity to present a Fourth Amendment claim to the state courts that is the basis of the Stone prohibition, without regard for whether that opportunity is actually exercised or is unsuccessful. Janecka, 301 F.3d at 320-21. Even if a defendant fails to take advantage of the opportunity to litigate a motion

to suppress or assert Fourth Amendment claims, the fact that the opportunity existed suffices for the Stone bar to apply.  Id., at 320.

The Fifth Circuit has also held that the Stone bar applies even in the face of error by the state court in deciding the merits of the Fourth Amendment claim.  Swicegood v. Alabama, 577 F.2d 1322, 1324-1325 (5th Cir. 1978).  "[I]n the absence of allegations that the processes provided by a state to fully and fairly litigate fourth amendment claims are routinely or systematically applied in such a way to prevent the actual litigation of fourth amendment claims on the merits, the rationale of Caver dictates that Swicegood's application of Stone despite a mistake in adjudicating the merits must apply with equal force to procedural mistakes that thwart the presentation of fourth amendment claims." Williams v. Brown, 609 F.2d 216, 220 (5th Cir. 1980);  Janecka, 301 F.3d at 321.

To obtain post-conviction relief in federal court, a habeas petitioner must plead and prove that the state court proceeding was inadequate.  Davis, 803 F.2d at 1372. Bauman does not allege or demonstrate that Louisiana state courts routinely or systematically preclude litigation of a defendant's Fourth Amendment claims.  Moreover, this court has found that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims."  Bailey v. Cain, No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007) ( Duval, J.) (order adopting referenced Report and Recommendation).

The record in this case amply demonstrates that Bauman had multiple opportunities to litigate his challenges to the search and seizure of the note from his car and was in fact provided review of his Fourth Amendment claim both pretrial and on direct appeal. The state trial court conducted a full hearing on his motion to suppress, including testimony from Detective Morales.[45] Morales testified that he saw the note through the opened car window when he was ascertaining the ownership of the car based on witness information.[46] Based on the information he already possessed, he had an officer collect the note for safe keeping. He testified that he did not wait for a search warrant because the car had to be towed from the scene in the same condition in which it was found.[47] He was concerned that, with the windows down, the note could be lost. He also removed a wallet next to the note to assure that it was not lost and to protect the owner's property.[48] The state trial court denied the motion, finding the search and seizure lawful. The Louisiana Fifth Circuit Court of Appeal denied Bauman's related writ application finding no error in that ruling, and the Louisiana Supreme Court also denied his subsequent writ application without comment.

Bauman's appellate counsel raised the issue again on direct appeal. The Louisiana Fifth Circuit determined that the search and seizure were lawful and justified under the

---

[45] St. Rec. Vol. 1 of 9, Minute Entry, 1/11/08; Hearing Transcript, 1/11/08.

[46] St. Rec. Vol. 1 of 9, Hearing Transcript, pp. 9-10, 1/11/08.

[47] Id., pp. 13-14, 16.

[48] Id., p. 15.

plain view exception to the warrant requirement. The Louisiana Supreme Court denied the related writ application without stated reasons.

The record demonstrates that Bauman was provided with ample opportunity to present his claims, although his efforts were unsuccessful. Thus, Bauman is not entitled to have this federal habeas court review his Fourth Amendment claims. Because he had more than sufficient opportunity for a full and fair hearing in the state courts, <u>Stone</u> bars consideration of his Fourth Amendment claims here.

VII.    <u>INSUFFICIENT EVIDENCE (CLAIM NO. 3)</u>

Bauman alleges that the evidence was not sufficient to prove that he had specific intent to commit second degree murder and, at best, proved only manslaughter. His counsel asserted the same argument on direct appeal to the Louisiana Fifth Circuit. The court denied relief, finding the claim without merit under the standards established in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), and related state law. The Louisiana Supreme Court also denied relief on this ground without stated reasons.

Under <u>Jackson</u>, this court must determine, after viewing the evidence in the light most favorable to the prosecution, whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. <u>Id</u>., 443 U.S. at 319; <u>Perez v. Cain</u>, 529 F.3d 588, 594 (5th Cir. 2008); <u>Williams v. Cain</u>, 408 Fed. Appx. 817, 821 (5th Cir. 2011). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of

the crime as defined by state law.  Perez, 529 F.3d at 594 (citing Jackson, 443 U. S. at 324 n. 16). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial.  See McDaniel v. Brown, 558 U.S. 120, __, 130 S.Ct. 665, 672, 674 (2010) (recognizing that a reviewing court is to consider the trial evidence as a whole under Jackson); Johnson v. Cain, 347 Fed. Appx. 89, 91 (5th Cir. 2009) (Jackson standard relies "upon the record evidence adduced at the trial.") (quoting Jackson, 443 U.S. at 324).

Review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.  United States v. Young, 107 Fed. Appx. 442, 443 (5th Cir. 2004) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir. 1993); see also Jackson, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").  Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.  Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005).

A reviewing federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. Alexander v. McCotter, 775 F.2d 595, 598 (5th Cir. 1985).  In addition, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence

determination, but rather whether it made a rational decision to convict or acquit.'" Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

A claim of insufficient evidence presents a mixed question of law and fact. Perez, 529 F.3d at 594; Maes v. Thomas, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to or an unreasonable application of United States Supreme Court precedent.

Bauman suggests that the evidence was sufficient to prove only manslaughter.[49] The applicable legal standard, however, requires that this court consider whether the evidence was sufficient to prove second degree murder, which was the verdict in his case.

Bauman was charged with and convicted of second degree murder, which is defined in relevant part by Louisiana law as "the killing of a human being . . . when the offender has a specific intent to kill or to inflict great bodily harm."[50] La. Rev. Stat. § 14:30.1(A)(1). The phrase "specific intent" is defined as the state of mind in which the

---

[49]In Louisiana, manslaughter is defined as a "homicide which would be first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La. Rev. Stat. Ann. § 14:31(A)(1); State v. Logan, 34 So.3d 528 (La. App. 2d Cir. 2010); State v. Quiambao, 833 So.2d 1103 (La. App. 2d Cir. 2002). "'Sudden passion' and 'heat of blood' are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them." State v. Logan, 34 So.3d at 535 (citing State v. Lombard, 486 So.2d 106 (La. 1986)); State v. Laird, 30 So.3d 1167 (La. App. 3rd Cir. 2010). Thus, it is the defendant's burden to prove by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" for a verdict of manslaughter to be appropriate. State v. Robinson, 754 So.2d 311 (La. App. 2d Cir. 2000).

[50]This was the definition used to charge Bauman's jury. St. Rec. Vol. 1 of 9, Jury Charges, p. 5, 5/14/08.

perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. § 14:10(1).

Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. <u>State v. Sharlhorne</u>, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); <u>State v. Tate</u>, 851 So.2d 921, 930 (La. 2003) (citing <u>State v. Brooks</u>, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill also can be implied by the intentional use of a deadly weapon, such as a knife or gun. <u>State v. Collins</u>, 43 So.3d at 251 (citing <u>State v. Brunet</u>, 674 So.2d 344, 349 (1996)).

At trial, the jury heard testimony that Michelle Bauman exited her office and was heard calling out that she had just been shot by her husband.[51] Bauman himself did not deny shooting her. Instead, he testified that he recalled shooting Michelle once and that he must have shot her the other three times, including twice in the back, although his memory was unclear.[52] He conceded during testimony that he could not testify what his intent was when he continued to shoot at her.[53]

Bauman also testified that, before the shooting, he drove around in his car while drinking, knowingly carrying a gun, before he called Michelle's office to speak with her

---

[51]St. Rec. Vol. 7 of 9, Trial Transcript, pp. 54, 56 (Guidroz), p. 64 (McKnight), 5/14/08.

[52]<u>Id.</u>, p. 86, 87.

[53]<u>Id.</u>, p. 92-93.

about visiting with their daughter.[54]  He had not attempted to visit or contact Michelle or his daughter since the divorce.[55]  When she hung up on him, he decided to drive to her office to force her to talk with him.[56]  It took about fifteen minutes for him to get to her office.[57]  On the other hand, Michelle's coworker, Brandy Ronquille, testified that she was only gone from the office for about ten minutes and Michelle had not mentioned that Bauman was coming to the office.[58]  Bauman also conceded that during his ride to the office he decided that he would use his gun to scare her into finishing the conversation and to ward off anyone who tried to stop him from talking to her.[59]  Once he arrived in the parking lot, he wrote a note apologizing to his parents for what he was about to do and then armed himself with the gun.[60]

After taking time to write the note, he went into Michelle's office, where no one was present to stop him from speaking with her.[61]  He conceded that, despite the fact that

---

[54]Id., p. 80, 83.

[55]Id., p. 78.

[56]Id., p. 81, 88.

[57]Id., p. 81, 93.

[58]Id., p. 46.

[59]Id., pp. 82, 84, 85.

[60]Id., pp. 82, 88, 94.

[61]Id., pp. 82, 84, 91-92.

he no longer had to ward off anyone, he did not put the gun away.[62]  Instead, he briefly

argued with Michelle, struggled briefly over the gun, regained control of the gun, then

purposefully shot her.[63]

The jury obviously found credible the evidence demonstrating that Bauman had

the specific intent to enter his ex-wife's office to cause her great bodily harm or kill her.

The evidence established that Bauman took about fifteen minutes to drive to his ex-

wife's office after she hung up the phone.  He also sat in his car and wrote a note

conceding that he was about to commit an act worthy of apology and which would land

him in jail.  He entered Michelle's office with his gun drawn and made no attempt to put

it away, even after he knew there was no one there to stop him from speaking with her.

He did not relent when Michelle allegedly tried to take the gun from him.  Instead, he

took control of the gun and shot her.  He then shot her several more times, including

twice in the back.

This evidence was more than sufficient for a reasonable jury to conclude that

Bauman had specific intent to kill his ex-wife because he actively desired the

consequences of his actions.  Under Louisiana law, the fact that he armed himself with

a gun which he planned to use with forceful purpose was sufficient to establish specific

intent.  The jury apparently chose not to credit the testimony about his drinking or to

---

[62]Id., pp. 91-93.

[63]Id., pp. 85-86.

conclude that his consumption of alcohol impaired his intent. There was no evidence to support the suggestion that Bauman acted with sudden passion or heat of blood sufficient to support a manslaughter conviction, especially where he admittedly had about fifteen minutes of driving time to cool his temper after the telephone hangup and an additional few minutes in the car to write the apology note conceding he was about to commit a crime that would result in imprisonment. Instead, the evidence and testimony were more than sufficient for a reasonable jury to conclude that Bauman acted with specific intent to kill or commit great bodily harm when he entered his ex-wife's office, armed with a gun, and shot her four times.

The state courts' denial of relief on Bauman's claim was not contrary to or an unreasonable application of Supreme Court precedent. Bauman is not entitled to relief on this claim.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that the petition of Josh D. Bauman for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and

legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[64]

New Orleans, Louisiana, this _____2nd_____ day of November, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[64]Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.